# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| ARTHUR P. CARDI, BIKRAM RANDHAWA, MARK GOVERS, STEVEN PLUNGER, and ROSIMARA TADROUS, Individually and On Behalf of All Others Similarly Situated, | : | Civil Action No.:  17-cv-4699 |
|  | : |  |
| Plaintiffs, | : |  |
|  | : |  |
| vs. | : |  |
|  | : |  |
| FXCM INC., FOREX CAPITAL MARKETS, LLC, FXCM HOLDINGS, LLC, DROR NIV, WILLIAM AHDOUT, JOHN DITTAMI, and EFFEX CAPITAL, LLC, | : |  |
|  | : |  |
| Defendants. | : |  |

## CLASS ACTION COMPLAINT

Plaintiffs Arthur P. Cardi, Birkram Randhawa, Mark Govers, Steven Plunger, and Rosimara Tadrous ("Plaintiffs"), individually and on behalf of all persons similarly situated, by their undersigned attorneys, for their class action complaint against FXCM, Inc. ("FXCM, Inc." together with Defendant Forex Capital Markets, LLC ("Forex Capital") and Defendant FXCM Holdings, LLC ("FXCM Holdings") (collectively herein "FXCM") allege the following based upon personal knowledge as to their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by FXCM, in addition to media and other available information about FXCM.

## NATURE OF THE ACTION

1.      This is a class action against Defendants listed below for violations of the Commodities Exchange Act, 7 U.S.C. § 1 *et seq.* (the "CEA"), violations of New York, California, Wisconsin, Oregon and South Carolina consumer laws, and unjust enrichment on behalf of all customers of FXCM who, between March 1, 2010 and February 6, 2017 (the "Class Period"), placed trade orders through FXCM's "No Dealing Desk" ("NDD Platform") while FXCM publicly stated that FXCM had no conflict of interest in the outcome of trades made on the NDD Platform.

2.      According to FXCM, retail customers' (like Plaintiffs here) profits or losses would have no effect on FXCM's interests, because FXCM's role was merely as an agent or credit intermediary. FXCM stated that customer trades would be directed to banks and other independent "market makers" that provided liquidity to the NDD Platform.

3.      FXCM's lack of conflict of interest was extremely material and a centerpiece to their trading platform and marketing efforts.   In fact, during the Class Period, FXCM acknowledged that this conflicts-free business model was a "core" philosophy of FXCM.

4.      Despite FXCM's claims of having no conflicts of interest for its retail customers trading on the NDD Platform, FXCM had an undisclosed financial interest in the market maker that consistently "won" the largest share of FXCM's NDD trading volume, Effex Capital, LLC ("Effex").   Defendant Effex was a front created by FXCM, which allowed FXCM to hold positions opposite its customers and financially benefit at its customers' expense — in direct contravention to FXCM's representations to customers and investors of conflict free trading on the NDD Platform.

5.      Defendant Effex was an FXCM-backed startup firm that was created and financed by FXCM.

6.      Intending to have Effex operate as a subsidiary of FXCM, in 2009, FXCM hired John Dittami ("Dittami"), a high frequency trader, to create an algorithmic trading system to serve as the foundation of a new trading platform that could make markets to FXCM's customers and thereby either replace or compete with the independent market makers on FXCM's NDD Platform.  Dittami completed the new algorithmic trading platform in early 2010.

7.      Because of red flags raised by its compliance department, FXCM created Effex as a separate stand-alone company to operate its new algorithmic trading system that Dittami built in order to conceal FXCM's economic interest in Effex from customers, regulators and investors.

8.      FXCM incorporated Effex and installed Dittami at its helm, but continued to own the trading system, finance the business, and maintain a 70% interest in all profits of Effex through thinly-veiled contractual arrangements.  Effex operated out of FXCM's offices rent-free for the first year of its existence, before renting its own offices, but continued to have two FXCM employees dedicated to working for Effex.

9.      Contrary to its public statements, FXCM manipulated its NDD Platform by placing Effex in front of independent market makers in routing retail customer orders while also permitting Effex to win all "ties" with other market makers.  FXCM provided Effex with a real-time view of price quotations offered by other market makers, and added smaller markups to Effex prices than to prices provided by other market makers.  This way FXCM ensured that the bulk of its order flow would go to Effex and generate profits for FXCM.

10.     This arrangement was very lucrative for FXCM, as FXCM was provided 70% of Effex's profits and Effex retained the balance.  These kickbacks amounted to nearly $80 million between 2010 and 2014, and they continued through 2016.

11.     During the Class Period, FXCM's quarterly and annual reports misrepresented that FXCM had no interest in the trades executed on its NDD Platform and therefore there were no conflicts of interest between FXCM and its customers who traded on the NDD Platform.

12.     FXCM's financial statements violated SEC regulations and generally accepted accounting principles ("GAAP") for failing to disclose FXCM's economic interest in, contractual and related party relationship with, and control over, Effex during the Class Period.  Given that FXCM was entitled to 70% of Effex's profits, FXCM was required to (*but did not*) consolidate Effex's operations as a variable interest entity.  Alternatively, even if Effex were not required to be consolidated, it was still a related party to FXCM and therefore, FXCM was required to (*but did not*) disclose the related party nature of the business relationship and the amount of profits FXCM was earning from Effex.

13.     As a result of FXCM's failure to properly account for its arrangements with Effex, all of FXCM's financial statements issued during the Class Period were false and misleading.

14.      On February 6, 2017, the U.S Commodity Futures Trading Commission ("CFTC") announced in a press release and accompanying Order that it had settled charges against FXCM and its two founders.

15.     The CFTC found that FXCM engaged in false and misleading solicitations of its retail foreign exchange ("forex") customers by concealing FXCM's relationship with its most important market maker, by misrepresenting that its NDD Platform had no conflicts of interest

with its customers, and cheating customers through dishonest trade execution. The Settlement imposed a civil penalty of $7 million and banned FXCM from operating in the U.S.

## JURISDICTION AND VENUE

16.    This action arises under Section 22 of the CEA, 7 U.S.C. § 25, and common law. This Court has subject matter jurisdiction over this action pursuant to Section 22 of the CEA, 7 U.S.C. § 25.

17.    This Court also has jurisdiction under 28 U.S.C. § 1332 because the amount in controversy for the Class exceeds $5,000,000.

18.    Defendants' conduct had substantial effect on the interstate commerce of the United States, including in this District. Defendants used the instrumentalities of interstate commerce to effectuate their illegal scheme.

19.    The Court has personal jurisdiction over each Defendant, because Defendants' collusive and manipulative acts took place in New York and in the United States. These acts were conducted by persons and entities subject to the laws of the United States, including New York, as well as other states and territories.

## PARTIES

**Plaintiffs**

20.    ***Plaintiff Arthur P. Cardi*** ("Cardi") engaged in transactions on FXCM's NDD Platform during the Class Period and has been injured in his business or property by reason of Defendants' violations of law as alleged herein. Plaintiff is a citizen of New York.

21.    ***Plaintiff Bikram Randhawa*** ("Randhawa") engaged in transactions through FXCM's NDD Platform during the Class Period and has been injured in his business or property by reason of Defendants' violations of law as alleged herein. Plaintiff is a citizen of California.

22.     **_Plaintiff Mark Govers_** ("Govers") engaged in transactions through FXCM's NDD Platform during the Class Period and has been injured in his business or property by reason of Defendants' violations of law as alleged herein.  Plaintiff is a citizen of Oregon.

23.     **_Plaintiff Steven Plunger_** ("Plunger") engaged in transactions through FXCM's NDD Platform during the Class Period and has been injured in his business or property by reason of Defendants' violations of law as alleged herein.  Plaintiff is a citizen of Wisconsin.

24.     **_Plaintiff Rosimara Tadrous_** ("Tadrous") engaged in transactions through FXCM's NDD Platform during the Class Period and has been injured in her business or property by reason of Defendants' violations of law as alleged herein.  Plaintiff is a citizen of South Carolina.

### Defendants

25.     **_Defendant FXCM, Inc._** ("FXCM") is a Delaware Corporation headquartered at 55 Water Street, Floor 50, New York, New York.  During the Class Period, FXCM was a holding company whose sole asset consisted of an equity interest in FXCM Holdings.  Following the release of the Regulator Orders described herein, FXCM changed its name to Global Brokerage, Inc.

26.     **_Defendant FXCM Holdings_** ("FXCM Holdings") was a Delaware-incorporated holding company that was the immediate corporate parent of Forex Capital.

27.     **_Defendant Forex Capital_** ("Forex Capital") offered trading platforms for foreign currency contracts.

28.     **_Defendant Dror Niv_** ("Niv") was Chairman of the Board of Directors of FXCM since 2010, and served on the Board of FXCM's predecessor, FXCM Holdings, since 1999.

Defendant Niv was the Chief Executive Officer of FXCM and is one of the original founding partners of FXCM.  Upon information and belief, Niv is a citizen of the state of Connecticut.

29.     *Defendant William Ahdout* ("Ahdout") was a director of FXCM since 2010, and served on the Board of FXCM Holdings since 1999.  Defendant Ahdout was with FXCM since 1999, was its Chief Dealer and a Managing Director and was one of the original founding partners of FXCM.  Upon information and belief, Ahdout is a citizen of the state of New York.

30.     "FXCM" refers to FXCM Inc., FXCM Holdings, Forex Capital, and any of their subsidiaries, either individually or collectively.

31.     *Defendant Effex Capital, LLC* ("Effex") is a Delaware limited liability company located in Jersey City, New Jersey.

32.     *Defendant John Dittami* ("Dittami") is the CEO of Effex and a former employee of FXCM.

## CLASS ACTION ALLEGATIONS

33.     Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b) on behalf of themselves and for all other persons similarly situated (i) of a nationwide class and (ii) state classes that consists of citizens of New York, California, Wisconsin, Oregon and South Carolina, and (iii) any other classes that can be certified under the laws of the different states which this Court deems appropriate for class certification.

34.     The Nationwide Class and states classes of persons that Plaintiffs seek to represent are defined as:

35.     The "Nationwide Class" is defined as:

> All persons who between March 10, 2010 and February 6, 2017 entered into a forex transaction through FXCM's "No Dealing Desk" platform.

36.    The "New York Class" is defined as:

All citizens of the State of New York who between March 10, 2010 and February 6, 2017 entered into a forex transaction through FXCM's "No Dealing Desk" platform.

37.    The "California Class" is defined as:

All citizens of the State of California who between March 10, 2010 and February 6, 2017 entered into a forex transaction through FXCM's "No Dealing Desk" platform.

38.    The "Wisconsin Class" is defined as:

All citizens of the State of Wisconsin who between March 10, 2010 and February 6, 2017 entered into a forex transaction through FXCM's "No Dealing Desk" platform.

39.    The "Oregon Class" is defined as:

All citizens of the State of Oregon who between March 10, 2010 and February 6, 2017 entered into a forex transaction through FXCM's "No Dealing Desk" platform.

40.    The "South Carolina Class" is defined as:

All citizens of the State of South Carolina who between March 10, 2010 and February 6, 2017 entered into a forex transaction through FXCM's "No Dealing Desk" platform.

41.    Excluded from the Nationwide Class, the New York Class, the California Class, the Wisconsin Class, the Oregon Class, and the South Carolina Class are Defendants' legal representatives, officers, directors, employees, assigns, and successors; the United States government and any agency or instrumentality thereof; the judge to whom this case is assigned and any member of the judge's immediate family.

42.    The exact number of members of the Nationwide Class, the New York Class, the California Class, the Wisconsin Class, the Oregon Class, and the South Carolina Class are believed to be so numerous that joinder of all members into one action, or into an individual

statewide action is impractical.  Upon information and belief, the Nationwide Class, the New York Class, the California Class, the Wisconsin Class, the Oregon Class, and the South Carolina Class consists of thousands of members.

43.    The claims raised by Plaintiffs are typical of the claims of the Nationwide Class, the New York Class, the California Class, the Wisconsin Class, the Oregon Class, and the South Carolina Class members, and all claims are based on the same general legal theories and claims for relief.

44.    There are common questions of law and fact that relate to and affect the rights of each member of the Nationwide Class, the New York Class, the California Class, the Wisconsin Class, the Oregon Class, and the South Carolina Class, and these questions predominate over any questions affecting only individual members.  The common issues include, but are not limited to:

(a)    Whether statements made by Defendants as part of their promise to provide, and assertions that they do provide, best execution of their clients' orders, discussed herein are true, or are reasonably likely to deceive, given the omissions of material fact described herein;

(b)    Whether federal, common law, and certain state consumer statutes were violated by Defendants' acts as alleged herein;

(c)    Whether Plaintiffs and the Nationwide Class, the New York Class, the California Class, the Wisconsin Class, the Oregon Class, and the South Carolina Class are entitled to damages; and

(d)    Whether Plaintiffs and the Nationwide Class, the New York Class, the California Class, the Wisconsin Class, the Oregon Class, and the South Carolina Class are entitled to restitution, other equitable relief, and/or other relief as may be proper.

45.     Plaintiffs' claims are typical of the claims of the members of the Nationwide Class, the New York Class, the California Class, the Wisconsin Class, the Oregon Class, and the South Carolina Class.  Each claim arises from the same facts, circumstances, and Defendants' course of conduct and practices.  Plaintiffs' legal theories are the same that will be asserted on behalf of the Nationwide Class, the New York Class, the California Class, the Wisconsin Class, the Oregon Class, and the South Carolina Class; namely, money damage claims arising from deceptive conduct which harmed consumers.

46.     Plaintiffs will fairly and adequately protect the interests of all members of the Nationwide Class, the New York Class, the California Class, the Wisconsin Class, the Oregon Class, and the South Carolina Class in the prosecution of this action and in the administration of all matters relating to the claims raised in this lawsuit.  Plaintiffs are similarly situated with all class members who purchased the FXCM NDD Platform, and they have sustained damages similar to those sustained by the members of the Nationwide Class, the New York Class, the California Class, the Wisconsin Class, the Oregon Class, and the South Carolina Class they seek to represent.

47.     Plaintiffs have retained the services of attorneys who are experienced and capable in prosecuting class action lawsuits.  Neither Plaintiffs nor Plaintiffs' counsel have any interests which might prevent them from vigorously pursuing this action.

48.     Maintaining this action as a class action is superior to all other available methods of adjudication because it will promote the convenient administration of justice and will achieve a fair and efficient adjudication of the controversy in this matter, which will affect the interests of tens of thousands of potential class members.

49.    The prosecution of separate actions by or against individual members of the Nationwide Class, the New York Class, the California Class, the Wisconsin Class, the Oregon Class, and the South Carolina Class would create a risk of inconsistent or varying adjudications that would confront Defendants with incompatible standards of conduct.

50.    Defendants' conduct was the same as to all members of the Nationwide Class, the New York Class, the California Class, the Wisconsin Class, the Oregon Class, and the South Carolina Class.

## FACTUAL ALLEGATIONS

### Background

51.    FXCM was founded in 1999.  In February 2017, FXCM changed its name from "FXCM Inc." to "Global Brokerage, Inc."  FXCM's sole asset is an equity interest in FXCM Holdings, LLC (now known as Global Brokerage Holdings LLC), of which FXCM is the sole managing member.  Forex Capital Markets LLC is the U.S. subsidiary of FXCM Holdings, LLC.

### FXCM Creates Its Own, Secret Market Maker

52.    In 2009, Defendants Niv, Ahdout and others at FXCM devised a plan to capitalize on FXCM's NDD Platform clients through the use of a high frequency trading algorithm.  This algorithm would completely replace or supplant many of the independent market makers on the NDD Platform and allow FXCM to cash in twice on its customers (first from its mark-ups, then from its kickback) while providing a purportedly conflict-free trading platform.

53.    To this end, FXCM hired a high-frequency trader, Dittami, in October 2009. Dittami was hired to create a new algorithmic trading system.  FXCM gave Dittami a contract promising him 30% of any profits generated by the new algorithmic trading system.  In early 2010, Dittami completed development of the algorithmic trading system sought by FXCM.

54.     Under Dittami's employment agreement, FXCM paid Dittami a base salary plus 30 percent of trading profits generated by Dittami's trading system. That meant that FXCM would keep the remaining 70 percent of trading profits.

55.     In early 2010, when Dittami was finalizing his trading algorithm, FXCM's Compliance Department voiced concerns that trading against FXCM's retail customers would contradict FXCM's marketing statements about its NDD model, which was supposedly free of such conflicts of interest.

56.     In response, FXCM spun off Dittami's trading system as an "external" or "independent" market maker for FXCM, solely for the purpose of falsely creating the appearance that Effex was an independent entity that was not owned or controlled by FXCM.

57.     On March 23, 2010, the new company (Effex) was created under the direction of FXCM.

58.     To further create the false impression of separation, Dittami "resigned" from FXCM on April 14, 2010, but Dittami and FXCM agreed that his resignation would not change their economic relationship, including FXCM retaining 70% of Dittami's (now Effex's) algorithmic trading profits.  FXCM also continued to own the intellectual property rights to the algorithmic trading platform's software.

59.     Soon after Effex was created, it entered services agreements with FXCM by which Effex would make monthly payments to FXCM of $21 per million dollars of trading volume executed by Effex.   FXCM intended this amount to approximate 70 percent of Effex's profits from trading on FXCM's retail forex platform against FXCM's retail customers.

60.     In conjunction with Effex's formation, FXCM funded Effex with a $2 million interest-free loan and allowed Effex to use FXCM's prime broker through a "prime of prime"

account.  When Dittami "resigned" from FXCM and "moved" to Effex, he continued working from FXCM's offices rent-free.  Effex operated from FXCM's offices in New York for a full year after Dittami's resignation from FXCM.

61.     Effex also used Dittami's trading algorithm – created for FXCM while Dittami was working for the Company and thus FXCM's intellectual property – to conduct its trading. For a period of time, Effex even used FXCM's servers and email systems.

62.     From 2010 to at least 2014, FXCM also gave bonuses, reimbursed by Effex, to two FXCM employees who assisted Effex on account of their work for the purportedly "independent" market maker.  From 2010 to 2014, one of the employees spent approximately 80 percent of the work week at Effex's offices.

## FXCM's Control of and Material Interest in Effex

63.     Pursuant to the services agreement, FXCM sent Effex monthly invoices for "order flow," which were to be paid by Effex to FXCM Holdings, a holding company owned by FXCM which owned FXCM's U.S. subsidiary.  Through August 2011, Effex paid $21 per million notional volume transacted by Effex on the FXCM retail forex platform. These payments were adjusted to $16 per million from September 2011 through July 2014 due to tightening spreads in the forex market.  This reduction was intended to compensate for Effex's lower profitability and to maintain the agreed upon 70/30 percent division of profits between FXCM and Effex.

64.     From 2010 to 2014, no market maker besides Effex paid FXCM for order flow. These payments were not order flow payments, but rather pre-negotiated kickbacks of FXCM's cut of profits generated by Effex from trading against FXCM's retail customers on the NDD Platform.

65.     FXCM even viewed Effex's trading profits and losses ("P&L") as its own, less Effex's 30 percent share.  In fact, FXCM calculated its monthly preliminary P&L statement, in part, by taking Effex's monthly P&L and simply subtracting 30 percent.

66.     FXCM directed Effex to remit these payments to FXCM Holdings, which was not a member of the NFA, in an effort to avoid the NFA's scrutiny over these dealings.

67.     In exchange for these payments from Effex, FXCM agreed that it would favor Effex over other market makers in routing retail customer orders.  FXCM permitted Effex to win all "ties" with other market makers; provided Effex with a real-time view of price quotations offered by other market makers; and added smaller markups to Effex's prices than to prices provided by other market makers.  This gave Effex a significant leg up on the truly external and independent market makers trading on FXCM's platform.

68.     In addition to favoring Effex over other market makers, FXCM allowed Effex to use a hold timer that enabled Effex to execute a trade at the start or end of a hold timer period, whichever was better for Effex. This asymmetrical price slippage practice deprived FXCM's customers of positive price improvements while giving customers negative price slippage, all to the benefit of Effex.

69.     Effex also used a "previous quote" practice whereby Effex submitted a quote to FXCM and FXCM would respond with an execution request based on the trading limits contained in a customer limit order, not the previous quote provided by FXCM.  This way Effex was using FXCM's inside knowledge of a customer's least favorable acceptable trade quote to ensure that it was getting the most favorable end of the bargain.

70.     On the same day Dittami resigned from FXCM, his trading algorithm was used in a "full-scale trading session" for the very first time.  Based on the trading that day, FXCM

anticipated that Effex would capture approximately 25-30% of overall trade volume on FXCM's NDD Platform – well above the market share Effex would have expected to capture in any other forex market.

71.     Not surprisingly, Effex routinely captured over 50% of FXCM's daily order flow and, at one time, captured nearly 80%.  All told, from 2010 through 2014, Effex rebated to FXCM nearly $80 million of Effex's trading revenue through its monthly payments to FXCM.

72.     The bulk of Effex's revenues were earned in transactions through FXCM. However, Effex was only able to profitably transact with other ECN's because of the pricing and order information that FXCM secretly provided to Effex.  Thus, Effex was wholly dependent on FXCM.

**<u>False and Misleading Statements to the Market</u>**

73.     Where a dealing desk broker acts as a "market maker" and may be trading against a customer's position, FXCM claimed that its agency model eliminated that conflict of interest. This was represented on FXCM's website.  For example, in 2010 the FXCM website displayed:



74.     In FXCM's agency model, price quotations were allegedly provided by banks and other third-party "market makers" -- sometimes also referred to as "liquidity providers" or "LPs", and not by FXCM's internal dealing desk.  FXCM explained its agency/No Dealing Desk model on its website as follows:

> FXCM makes an identical amount of money in the form of pip markups (which are really commissions) regardless of whether the customer made or lost money on the account.  FXCM receives prices from global banks, financial institutions, and other market makers in the foreign exchange markets.  A best bid/offer engine sorts those prices and marks them up with our standard markup on the majors.  This markup acts as the commission on the trade. When a customer clicks on a price, they are actually clicking on a price from the bank that currently has the best bid or offer, plus our markup.  Given that we make money on a per trade basis, we are motivated to encourage size and high frequency and it is why we offer extra incentives to clients.  It's also why we dedicate a lot of resources in trying to improve client profitability so they have the money to stay around and trade in bigger sizes.  We don't benefit from customer losses.

75.     Additionally, FXCM suppressed the facts it was not using third-party market makers but was instead relying primarily on one market maker that FXCM had an intimate business relationship.

76.     On March 15, 2012, the Company filed an annual report on Form 10-K with the SEC announcing the Company's financial and operating results for the fiscal year ended December 31, 2011 (the "2011 Form 10-K").   The 2011 Form 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

77.     The 2011 Form 10-K touted the Company's agency model, which purportedly aligned its interests with those of its customers, stating in relevant part:

> *Our agency model is fundamental to our core business philosophy because we believe that it aligns our interests with those of our customers*, reduces our risks and provides distinct advantages over the principal model used by the majority of retail FX brokers. *In the principal model, the retail FX broker sets the price it presents to the customer and may maintain its trading position if it believes the price may move in its favor and against the customer*. We believe this creates an inherent conflict between the interests of the customer and those of the principal model broker. Principal model brokers' revenues typically consist primarily of trading gains or losses and are more affected by market volatility than those of brokers utilizing the agency model.

(Emphasis added).

78.     On March 18, 2013, FXCM filed an annual report on Form 10-K with the SEC announcing its financial and operating results for the fiscal year ended December 31, 2012 (the "2012 Form 10-K"). The 2012 Form 10-K contained signed SOX certifications attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

79.     The 2012 Form 10-K touted FXCM's agency model, which purportedly aligned its interests with those of its customers, stating in relevant part:

> *We primarily offer our customers what is referred to as an agency model to execute their trades. Our agency model is fundamental to our core business philosophy because we believe that it aligns our interests with those of our customers* and reduces our risks. In the agency model, when our customer executes a trade on the best price quotation offered by our FX market makers, we act as a credit intermediary, or riskless principal, simultaneously entering into offsetting trades with both the customer and the FX market maker. We earn trading fees and commissions by adding a markup to the price provided by the FX market makers and generate our trading revenues based on the volume of transactions and the spread earned on transactions.

(Emphasis added).

80.    On March 17, 2014, the Company filed an annual report on Form 10-K with the SEC announcing the Company's financial and operating results for the fiscal year ended December 31, 2013 (the "2013 Form 10-K").  The 2013 Form 10-K contained signed SOX certifications attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

81.    The 2013 Form 10-K touted the Company's agency model, which purportedly aligned its interests with those of its customers, stating in relevant part:

> *We primarily offer our customers what is referred to as an agency model to execute their trades. Our agency model is fundamental to our core business philosophy because we believe that it aligns our interests with those of our customers* and reduces our risks.  In the agency model, when our customer executes a trade on the best price quotation offered by our FX market makers, we act as a credit intermediary, or riskless principal, simultaneously entering into offsetting trades with both the customer and the FX market maker. We earn trading fees and commissions by adding a markup to the price provided by the FX market makers.

(Emphasis added).

82.    On March 16, 2015, the Company filed an annual report on Form 10-K with the SEC announcing the Company's financial and operating results for the fiscal year ended December 31, 2012 (the "2014 Form 10-K"). The 2014 Form 10-K contained signed SOX certifications attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

83.    The 2014 Form 10-K touted the Company's agency model, which purportedly aligned its interests with those of its customers, stating in relevant part:

> ***We primarily offer our customers what is referred to as an agency model to execute their trades. Our agency model is fundamental to our core business philosophy because we believe that it aligns our interests with those of our customers*** and reduces our risks. In the agency model, when our customer executes a trade on the best price quotation offered by our FX market makers, we act as a credit intermediary, or riskless principal, simultaneously entering into off setting trades with both the customer and the FX market maker.  This agency model has the effect of automatically hedging our positions and eliminating market risk exposure. Generally, we earn trading fees through commissions or by adding a markup to the price provided by the FX market makers. In certain geographic locations, we provide our customers with the price provided by the FX market makers and display trading fees and commissions separately.

(Emphasis added).

84.    On March 11, 2016, the Company filed an annual report on Form 10-K with the SEC announcing the Company's financial and operating results for the fiscal year ended December 31, 2015 (the "2015 Form 10-K").  The 2015 Form 10-K contained signed SOX certifications attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

85.    The 2015 Form 10-K touted the Company's agency model, which purportedly aligned its interests with those of its customers, stating in relevant part:

> ***We primarily offer our customers what is referred to as an agency model to execute their trades. Our agency model is fundamental to our core business philosophy because we believe that it aligns our interests with those of our customers*** and reduces our risks. In the agency model, when our customer executes a trade on the best price quotation offered by our FX market makers, we act as a credit intermediary, or riskless principal, simultaneously entering into offsetting trades with both the customer and the FX market maker. This agency model has the effect of automatically hedging our positions and eliminating market risk exposure. Beginning in 2015, we began to offer a dealing desk, or principal, execution model to smaller retail clients.

Under the dealing desk model, we maintain our trading position and do not offset the trade with another party on a one for one basis. CFDs are primarily a dealing desk offering. By combining smaller positions and trading them out on an aggregate basis, we are able to optimize revenues from accounts that are less actively traded. Generally, under both models, we earn trading fees through commissions or by adding a markup to the price provided by the FX market makers. In certain geographic locations, we provide our customers with the price provided by the FX market makers and display trading fees and commissions separately. Revenues earned under the dealing desk model also include our realized and unrealized foreign currency trading gains or losses on our positions with customers.

(Emphasis added).

86. The 2015 Form 10-K also stated the following with regards to its NDD Platform execution:

Standard

**With an FXCM Standard account, a client has access to 24/7 support, No Dealing Desk execution, and free access to DailyFX plus.** The Standard account offers Electronic Communication Network ("ECN")-style low commission pricing similar to stocks. Standard accounts have a $2,000 minimum.

(Emphasis added).

### Regulators Take Action, Bar FXCM and Founders from U.S., Levy Fines of $7 Million, and Accuse FXCM of Lying to NFA

87. On February 6, 2017, an order was entered by the U.S Commodity Futures Trading Commission ("CFTC") in the matter of Forex Capital Markets, LLC, FXCM Holdings, LLC, Dror Niv, and William Ahdout ("Respondents"), bearing CFTC Docket Number 17-09 and entitled "Order Instituting Proceedings Pursuant To Sections 6(c) and 6(d) Of The Commodity Exchange Act, Making Findings, And Imposing Remedial Sanctions" (the "Order").  As stated in that Order: "In anticipation of the institution of an administrative proceeding, Respondents have

submitted an Offer of Settlement ("Offer"), which the Commission has determined to accept."

This Order was summarized in the CFTC press release, described below.

88.     On February 6, 2017, the CFTC announced that it banned the Company from

operating in the United States after finding that FXCM was taking positions opposite its retail

customers, stating in part:

RELEASE: pr752817

February 6, 2017

***CFTC Orders Forex Capital Markets, LLC (FXCM), Its Parent
Company, FXCM Holdings, LLC and FXCM's Founding
Partners, Dror Niv and William Ahdout, to Pay a $7 Million
Penalty for FXCM's Defrauding of Retail Forex Customers***

***FXCM, Niv, and Ahdout are Prohibited from Registering with
the CFTC, Acting in Exempt Capacities or Acting as Principals,
Agents, Officers or Employees of Registrants CFTC's Order also
holds FXCM, Niv, and FXCM Holdings responsible for FXCM's
False Statements to the National Futures Association***

Washington, DC – The U.S. Commodity Futures Trading
Commission (CFTC) today issued an Order filing and settling
charges against Forex Capital Markets, LLC (FXCM), its parent
company, FXCM Holdings, LLC (FXCM Holdings), and two
founding partners, Dror ("Drew") Niv, and William Ahdout, who
were, respectively, Chief Executive Officer of FXCM and
Managing Director of FXCM, (collectively, Respondents).
FXCM's principal place of business is New York, New York; Niv
resides in Connecticut; and Ahdout resides in New York.

***The CFTC Order finds that, between September 4, 2009 though
at least 2014 (the Relevant Period), FXCM engaged in false and
misleading solicitations of FXCM's retail foreign exchange
(forex) customers by concealing its relationship with its most
important market maker and by misrepresenting that its "No
Dealing Desk" platform had no conflicts of interest with its
customers. The Order finds FXCM, FXCM Holdings, and Niv
responsible for FXCM making false statements to the National
Futures Association (NFA) about its relationship with the market
maker***.

The Order requires Respondents jointly and severally to pay a $7 million civil monetary penalty and to cease and desist from further violations of the Commodity Exchange Act and CFTC Regulations, as charged. FXCM, Niv, and Ahdout agree to withdraw from CFTC registration; never to seek to register with the CFTC; and never to act in any capacity requiring registration or exemption from registration, or act as a principal, agent, officer, or employee of any person that is registered, required to be registered, or exempted from registration with the CFTC.

**"The CFTC Is Committed to Protecting Customers from Harm in the Markets It Regulates"**

"Full and truthful disclosure to customers and honest discourse with self-regulatory organizations such as NFA are vital to the integrity and oversight of our markets," said Gretchen L. Lowe, Principal Deputy Director and Chief Counsel of the CFTC's Division of Enforcement. "Today's actions demonstrate that the CFTC is committed to protecting customers from harm in the markets it regulates."

FXCM is registered with the CFTC as a Futures Commission Merchant and Retail Foreign Exchange Dealer. FXCM has been providing retail customers with access to over-the-counter forex markets through a proprietary technology platform and has acted as counterparty in transactions with its retail customers in which customers can buy one currency and simultaneously sell another. Both Niv and Ahdout were CFTC registrants during the relevant period.

FXCM, under Niv's and Ahdout's direction and control, misrepresented to its retail forex customers that when they traded forex on FXCM's No Dealing Desk platform, FXCM would have no conflict of interest, the Order finds. In addition, according to FXCM's marketing campaign, retail customers' profits or losses would have no impact on FXCM's bottom line, because FXCM's role in the customers' trades was merely that of a credit intermediary, the Order finds. FXCM further represented that the risk would be borne by banks and other independent "market makers" that provided liquidity to the platform, according to the Order.

**FXCM's Undisclosed Interest**

Contrary to these representations, the Order finds, FXCM had an undisclosed interest in the market maker that consistently "won"

the largest share of FXCM's trading volume – and thus was taking positions opposite FXCM's retail customers. FXCM, the Order finds, formulated a plan in 2009 to create an algorithmic trading system, using an FXCM computer program that could make markets to FXCM's customers, and thereby either replace or compete with the independent market makers on FXCM's "No Dealing Desk" platform. Although FXCM eventually spun off the algorithmic trading system as a new company, in actuality the company remained closely aligned with FXCM, according to the Order. This market maker received special trading privileges, benefitted from a no-interest loan provided by FXCM, worked out of FXCM's offices, and used FXCM employees to conduct its business, the Order further finds.

The Order finds that FXCM and the market maker agreed that the market maker would rebate to FXCM approximately 70 percent of its revenue from trading on FXCM's retail forex platform. In total, through monthly payments from 2010 through 2014, the company rebated to FXCM approximately $77 million of the revenue it achieved. However, FXCM did not disclose to customers, among other things, that this company – FXCM's principal market maker – was a startup firm spun off from FXCM, the Order further finds

**False Statements to the NFA**

The Order also finds that FXCM willfully made false statements to NFA in order to conceal FXCM's role in the creation of its principal market maker as well as the fact that the market maker's owner had been an FXCM employee and managing director. The Order finds that during a meeting between NFA compliance staff and FXCM executives, Niv omitted to mention to NFA the details of FXCM's relationship with the market maker.

The Order holds Niv and Ahdout liable for FXCM's fraud violations as "controlling persons" who were responsible, directly or indirectly, for FXCM's violations. Niv is also held liable for FXCM's false statements to NFA as a controlling person who was responsible directly or indirectly for those violations. FXCM Holdings is held liable for FXCM's fraud and false statement violations as principal of FXCM, the Order also finds.

89.    On February 7, 2017, FXCM filed a report on Form 8-K with the SEC announcing its settlement agreements with the CFTC and National Futures Association ("NFA")

(the "2/7/17 Form 8-K"). Among other things, the 2/7/17 Form 8-K stated: "Pursuant to the settlement agreements, the Company will be withdrawing from business in the United States."

90.    As a direct result of Defendant's deceptive practices and actions as described above, Plaintiffs were damaged in that Plaintiffs would not have placed orders on the Company's platform had they known of the conflict of interest and that the Company was trading against and profiting from Plaintiffs.

**FXCM's False and Misleading Class Period Statements To Regulators**

91.    As a part of FXCM's ongoing efforts to obscure and conceal its relationship with Effex, FXCM also misled regulators from the NFA.

92.    In connection with the NFA's 2013 examination of FXCM, NFA compliance staff met with FXCM executives on October 24, 2013.  In response to the NFA's questions about FXCM's relationship with Effex, Defendant Niv neglected to mention any of the details described above concerning FXCM's relationship with Effex and Dittami.  Defendant Niv misrepresented that he had a prior working relationship with Dittami from when Dittami was employed by other liquidity providers.

93.    Members of FXCM's compliance department also made a series of misstatements to the NFA.  On October 22, 2013, an FXCM compliance officer told the NFA in an email: "FXCM LLC does not have any direct or indirect ownership, interest, or affiliation with entities that provide liquidity to retail clients . . . ."

94.    After the NFA sought clarification of this statement, another FXCM compliance officer stated in a March 24, 2014 email: "To my knowledge, there are no present or past owners principals, APs, or employees of affiliates of FXCM LLC that have direct or indirect ownership,

interest, or affiliation with entities that provide liquidity to retail clients on our No Dealing Desk Model."

95.     On April 4, 2014, in response to further attempts by the NFA to clarify the FXCM/Effex relationship, an FXCM employee stated in an email that Dittami served as a consultant for FXCM from October 2009 through April 2010, working primarily on software coding — in an attempt to downplay Dittami in connection with NFA's inquiry into FXCM's relationship with Effex.

96.     Defendant Niv participated in and approved of FXCM's false responses to the NFA's investigation.

## COUNT I

### Violation of the Commodities Exchange Act 7 U.S.C. § 1, *et seq.* and Regulation 5.2(b) Against FXCM

97.     Plaintiffs incorporate by reference each and every preceding allegation as if it is specifically set forth herein.

98.     FXCM made materially false and misleading statements to Plaintiffs and all FXCM customers.  For example, FXCM misrepresented to Plaintiffs and its customers that it was merely acting as an agent between retail customers and market makers on the NDD Platform and that it did not take positions opposite retail customers.  However, FXCM benefitted from losses sustained by customers through its substantial interest in Effex.  This undisclosed conflict began in 2010 and was not disclosed to FXCM customers until February 2017.

99.     FXCM employees had full knowledge of the representations that the firm was making to Plaintiffs and its customers about the NDD Platform, as well as the facts about Effex and Dittami's relationships with FXCM.  Thus, FXCM knowingly or recklessly misrepresented

and failed to disclose to Plaintiffs and its retail customers the true nature of its relationship with Effex.

100.    Plaintiffs and the Nationwide Class who purchased or sold forex transactions through FXCM's NDD Platform during the Class period were injured and are each entitled to their actual damages for the violations of the CEA alleged herein.

## COUNT II

### Violation of the Commodities Exchange Act 7 U.S.C. § 1, *et seq.*
### Against FXCM Inc., FXCM Holdings, and Forex Capital

101.    Plaintiffs incorporate by reference each and every preceding allegation as if it is specifically set forth herein.

102.    Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B) states in relevant part: "[t]he act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust."

103.    All of the illegal actions described herein were committed by FXCM employees, and all of their actions and omissions were within the scope of their employment when their conduct violated Section 4b of the CEA.  FXCM Inc., FXCM Holdings, and Forex Capital are therefore liable for its agents' violations of those provisions.  FXCM Holdings is strictly liable as principal for Forex Capital's violations of the CEA because FXCM Holdings was the parent company of Forex Capital, their interests and business activities were sufficiently intertwined, and FXCM Holdings directly controlled the operations of FXCM as they related to the violations.

104.     FXCM, Inc. is strictly liable as sole managing member of FXCM Holdings, their interests and business activities were sufficiently intertwined, and FXCM Inc. controlled the operations of FXCM Holdings and Forex Capital as they related to the violations.

105.     Plaintiffs and the Nationwide Class are each entitled to actual damages sustained for the violations of the CEA alleged herein.

## COUNT III

### Violation of the CEA 7 U.S.C. § 1, *et seq.*
### Against Defendants Niv, Ahdout and Effex

106.     Plaintiffs incorporate by reference each and every preceding allegation as if it is specifically set forth herein.

107.     Section 13(b) of the CEA, 7 U.S.C. § 13c(b) states in relevant part: "[a]ny person who, directly or indirectly, controls any person who has violated any provision of this chapter or any of the rules, regulations, or orders issued pursuant to this chapter may be held liable for such violation."

108.     Defendants Niv, Ahdout and Effex each knowingly aided and abetted the violations of the CEA by Forex Capital, as alleged herein.

109.     Defendants Niv, Ahdout and Effex did the aforesaid knowingly and thus willfully intended to assist these misrepresentations and pricing manipulations, in violation of Section 4b.

110.     Plaintiffs and the Nationwide Class are each entitled to actual damages sustained for the violations of the CEA alleged herein.

## COUNT IV

### (Violations of New York General Business § 349
### on Behalf of Plaintiff Cardi and a New York Class)

27

111.    Plaintiff Cardi on behalf of himself and the New York Class, repeats and reasserts each of the allegations contained above as if fully set forth herein.

112.    GBL Section 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state."

113.    FXCM violated GBL Section 349 because it engaged in (a) consumer-oriented conduct that was (b) materially misleading and that (c) caused plaintiff to suffer injury as a result of the Defendants' deceptive act or practice.

114.    FXCM engaged in commercial conduct by selling the use of its NDD Platform to customers in New York and elsewhere.

115.    FXCM's profited from the sale of its NDD Platform to Plaintiff Candi and members of the New York Class.

116.    The deceptive acts of FXCM and its agents were directed at New York citizens.

117.    FXCM and its agents misled Plaintiff Cardi (and the New York Class) for all of the aforesaid reasons.

118.    The deceptive practices of FXCM and its agents caused Plaintiff Cardi (and the New York Subclass) to suffer losses and to pay monies in excess of what they should have paid had FXCM not engaged in the aforesaid deceptive practices.

119.    The unfair practices of FXCM and its agents offend public policy and are immoral, unethical, oppressive, unscrupulous, and substantially injurious to the New York Class.

## COUNT V

**(California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200
*et seq.* by Plaintiff Randhawa on Behalf of the California Class)**

120.    Plaintiff Randhawa on behalf of himself and the California Class, repeats and reasserts each of the allegations contained above as if fully set forth herein.

121.    The Unfair Competition Law, California Business & Professions Code §§ 17200, et seq. (the "UCL"), prohibits any "unlawful," "unfair," or "fraudulent" business act or practice and any false or misleading advertising.

122.    In the course of conducting its business, FXCM and its agents committed unlawful business practices by, *inter alia*, making the representations (which also constitute advertising within the meaning of § 17200) and omissions of material facts, as set forth more fully herein, and violating Cal. Civil Code §§ 1750*, et seq.*, and the common law.

123.    Plaintiff Randhawa, individually and on behalf of other California Class members, reserves the right to allege other violations of law which constitute other unlawful business acts or practices.

124.    The actions of FXCM and its agents constitute "unfair" business acts or practices because, as alleged above, *inter alia*, FXCM engaged in deceptive and false advertising, and misrepresented and omitted material facts regarding its NDD Platform, and thereby offended an established public policy, and engaged in immoral, unethical, oppressive, and/or unscrupulous activities that are substantially injurious to consumers. This conduct constitutes violations of the unfair prong of Business & Professions Code §§ 17200, *et seq.*

125.    The California Business & Professions Code §§ 17200, *et seq.*, also prohibits any "fraudulent business act or practice."

126.    The actions, claims, nondisclosures, and misleading statements of FXCM and its agents, as alleged in this Complaint, also constitute "fraudulent" business practices in violation of the UCL because, among other things, they are false, misleading, and/or likely to deceive reasonable consumers within the meaning of Business & Professions Code §§ 17200, *et seq.*

127.    There were reasonably available alternatives to further FXCM's legitimate business interests, other than the conduct described herein.

128.    As a result of the pervasive false marketing, including deceptive and misleading acts and omissions by FXCM and its agents as detailed in this Complaint, Plaintiff Randhawa and other members of the California Class have in fact been harmed as described above.  If Defendants had not misrepresented their NDD Platform, Plaintiff Randhawa would not have purchased it.

129.    As a result of the unlawful, unfair, and fraudulent practices of FXCM and its agents, Plaintiff Randhawa and the other California Class members have suffered injury in fact and lost money.

130.    As a result of their deception, FXCM has been able to reap unjust revenue and profit in violation of the UCL.

131.    As a result of the conduct of FXCM and its agents in violation of the UCL, Plaintiff Randhawa and members of the California Class have been injured as alleged herein in amounts to be proven at trial because they purchased the use of FXCM's NDD Platform without full disclosure of the material facts discussed above.

132.    As a result, Plaintiff Randhawa individually, and on behalf of the California Class, and the general public, seeks restitution and disgorgement of all money obtained from Plaintiff Randhawa and the members of the California Class and collected by Defendants as a result of the aforesaid unlawful, unfair, and/or fraudulent conduct, and seeks injunctive relief, and all other relief this Court deems appropriate, consistent with Business & Professions Code § 17203.

## COUNT VI

### (Violation of the Oregon Unlawful Trade Practices Act, O.R.S. § 646.605, *et seq.* by Plaintiff Govers On Behalf of the Oregon Class)

133.    Plaintiff Govers on behalf of himself and the Oregon Class, repeats and reasserts each of the allegations contained above as if fully set forth herein.

134.    Chapter 646 of the Oregon Revised Statutes generally governs unlawful trade practices within the State of Oregon (the "OUTPA"). O.R.S. § 646.605, *et seq.*

135.    Under the OUTPA, "trade" and "commerce" mean "advertising, offering or distributing, whether by sale, rental or otherwise, any real estate, goods or services, and include any trade or commerce directly or indirectly affecting the people of this state." O.R.S. § 646.605(8).

136.    Under the OUTPA, "unconscionable tactics" include actions which "[k]nowingly take[] advantage of a customer's physical infirmity, ignorance, illiteracy or inability to understand the language of the agreement" and "[k]nowingly permit[] a customer to enter into a transaction from which the customer will derive no material benefit. O.R.S. § 646.605(9).

137.    The OUTPA outlaws "any unconscionable tactic in connection with selling, renting or disposing of real estate, goods or services, or collecting or enforcing an obligation" O.R.S. § 646.607.

138.    Further, the OUTPA outlaws practices which "[e]ngage[] in any other unfair or deceptive conduct in trade or commerce. O.R.S. § 646.608(1)(u).

139.    In the course of business, FXCM and its agents misrepresented that FXCM had no conflict of interest in the outcome of trades made on the NDD Platform.   Through this misrepresentation, Defendants deceived Plaintiff Govers and Oregon Class members with

31

respect to material facts regarding the use of the NDD Platform.  Further, FXCM and its agents engaged in trade practices with a tendency or capacity to deceive.  Moreover, FXCM and its agents engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, unfair practices and/or concealment, suppression or omission of any material fact with intent that others rely upon such concealment or misstatement in connection with the sale of FXCM's NDD Platform.

140.    Further, FXCM and its agents, in the course of advertising and selling the use of the FXCM NDD Platform, took advantage of Plaintiff Govers and Oregon Class members' lack of knowledge and/or understanding of FXCM's NDD Platform.

141.    FXCM and its agents also allowed Plaintiff Govers and Oregon Class members to enter in to a commercial transaction from which they would derive less of a benefit.

142.    By failing to disclose that FXCM did have a conflict of interest in its NDD Platform, FXCM and its agents engaged in unfair or deceptive business practices in violation of the OUTPA.

143.    FXCM's unfair or deceptive acts or practices, including FXCM's conflict of interest in the outcome of trades made on the NDD Platform, deceived reasonable consumers, including Plaintiff Govers and members of the Oregon Class about the NDD Platform.

144.    FXCM knew that the representations it and its agents made were false and misleading.

145.    Plaintiff Govers and members of the Oregon Class suffered an ascertainable loss caused by the misrepresentations and failure to disclose material information by FXCM and its agents.

146.    The unlawful acts and practices by FXCM and its agents complained of herein affect the public interest.

## COUNT VII

### (Violation of Wisconsin Statutes Sections 895.446 and 943.20 on Behalf of Plaintiff Plunger and the Wisconsin Class)

147.    Plaintiff Plunger behalf of himself and the Wisconsin Class, repeats and reasserts each of the allegations contained above as if fully set forth herein.

148.    Wisconsin Statutes Section 895.446 permits civil causes of action for violations of certain criminal statutes, including Wisconsin Statutes section 943.20, which prohibits "[o]btain[ing] title to property of another person by intentionally deceiving the person with a false representation which is known to be false, made with intent to defraud, and which does defraud the person to whom it is made." Wis. Stat. § 943.20.

149.    FXCM and its agents made false representations, including but not limited to, its conflict of interest in the outcome of trades made on the NDD Platform

150.    FXCM knew that the representations made by it and its agents were deceptive and misleading.

151.    FXCM and its agents made the representations at issue with the intent to deceive and defraud Plaintiff Plunger and the Wisconsin Class.

152.    Plaintiff Plunger and the Wisconsin Class were in fact deceived and defrauded by the representations made by FXCM and its agents.

153.    As a result of its false representations, FXCM obtained money via the sale of the use of their NDD Platform to Plaintiff Plunger and the Wisconsin Class.

154.    Plaintiff Plunger and the Wisconsin Class are thus entitled to actual damages, attorneys' fees, costs and expenses, and punitive damages, as Wisconsin Statutes section 895.446(3)(a)(b)(c) authorizes.

## COUNT VIII

### (Violation of South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10, *et seq.* on Behalf of Plaintiff Tadrous and the South Carolina Class)

155.    Plaintiff Tadrous behalf of herself and the South Carolina Class, repeats and reasserts each of the allegations contained above as if fully set forth herein.

156.    FXCM and its agents engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10, *et seq.*

157.    Plaintiff Tadrous and members of the South Carolina Class were deprived of free and open competition.

158.    Plaintiff Tadrous and members of the South Carolina Class paid artificially inflated prices for NDD Platform.

159.    During the Class Period, the illegal conduct of FXCM and its agents had a substantial effect on South Carolina commerce.

160.    As a direct and proximate result of the unlawful conduct of FXCM and its agents, Plaintiff Tadrous and members of the South Carolina Class have been injured in their business and property.

161.    FXCM and its agents engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §§ 29-5-10, *et seq.*, and, accordingly, Plaintiff Tadrous and the members of the South Carolina Class seek all relief available under that statute.

**COUNT IX**

**(Unjust Enrichment Against FXCM Inc.,
FXCM Holdings, Forex Capital and Effex Capital, LLC )**

162.     Plaintiffs incorporate by reference each and every preceding allegation as if it is specifically set forth herein.

163.     As a result of the aforesaid deceptive and unfair practices, Plaintiffs, the Nationwide Class, the New York Class, the California Class, the Wisconsin Class, the Oregon Class, and the South Carolina Class have been harmed because revenues flowed improperly to FXCM, Inc., FXCM Holdings, Forex Capital and Effex Capital, LLC.

164.     FXCM, Inc., FXCM Holdings, Forex Capital, and Effex Capital, LLC have been enriched, at the expense of unwitting consumers, by profiting from the unconscionable practices.

165.     Plaintiffs and the Nationwide Class, the New York Class, the California Class, the Wisconsin Class, the Oregon Class, and the South Carolina Class are entitled to damages as a result of the unjust enrichment of FXCM, Inc., FXCM Holdings, Forex Capital, and Effex Capital, LLC including the disgorgement of all revenue received by Defendants as a result of the foregoing, plus interest.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for judgment against Defendants as follows:

(A)     Certifying this action as a class action and appointing Plaintiffs as Class representatives and their counsel as class counsel for the Nationwide Class, the New York Class, the California Class, the Wisconsin Class, the Oregon Class, and the South Carolina Class;

(B)     For a judgment awarding Plaintiffs and members of the Nationwide Class, the New York Class, the California Class, the Wisconsin Class, the Oregon Class, and the South

Carolina Class damages against Defendants for their violations of the CEA, together with prejudgment interest at the maximum rate allowable by law;

(C)    For a judgment awarding Plaintiffs and members of the Nationwide Class, the New York Class, the California Class, the Wisconsin Class, the Oregon Class, and the South Carolina Class damages against Defendants for their violations of common law and state consumer statutes;

(D)    Imposing a constructive trust on all monies wrongfully obtained by Defendants; and

(E)    Directing FXCM to identify, with Court supervision, victims of its conduct and pay them restitution and disgorgement of all monies acquired by FXCM by means of any act or practice declared by this Court to be wrongful.

## <u>JURY DEMAND</u>

Plaintiffs hereby demand a trial by jury.

Dated:  June 21, 2017

**GAINEY McKENNA & EGLESTON**


By: */s/ Thomas J. McKenna*
      Thomas J. McKenna
Gregory M. Egleston
440 Park Avenue South, 5th Floor
New York, NY 10016
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

*Attorneys for Plaintiffs*